# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| JEFFREY QUINN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 6:15-cv-03203-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff Jeffrey Quinn seeks review of the Administrative Law Judge's decision denying his application for Social Security Disability Insurance benefits. For the following reasons, the decision of the Administrative Law Judge ("ALJ") is reversed, and the case is remanded for reconsideration.

## I. Background

### A. Medical History

Quinn alleges disability beginning on March 31, 2011. He suffers from physical conditions as the result of a fall which occurred in May 2010, as well as a variety of psychological diagnoses.

On May 4, 2010, Quinn presented to the emergency room for altered mental status and vomiting blood following a fall. He was diagnosed with altered mental status, sepsis, renal insufficiency, and elevated liver enzymes. A CT and an EKG were normal, but a

1

toxicology screening was positive for benzodiazepines and cannabis. He saw Dr. Scott McMurray for an evaluation of his right shoulder, and was noted to have a limited range of motion in both shoulders and MRI results consistent with multiple contusions with edema. Quinn was discharged from the hospital on May 25, 2010, and admitted to Missouri Rehabilitation Center for metabolic encephalopathy with impaired functional status, impaired cognition, impulsivity, and alcoholism. Following further rehabilitation, he was discharged on June 14, 2010. Quinn continued to receive occupational therapy twice weekly through November 2010. He also continued to receive psychiatric care.

On August 16, 2010, Quinn presented to Dr. Salvador Ceniceros for a clinical psychiatric evaluation. Dr. Ceniceros noted that Quinn was only able to recall two of three words after five minutes and that he had a dysphoric mood. Quinn was diagnosed with recurrent major depression with a Global Assessment of Functioning ("GAF") score of 58. On September 7, 2010, Quinn saw Kevin Robertson, LPC, for an evaluation. Quinn reported a down mood, anhedonia, appetite and sleep problems, and feelings of hopelessness, worthlessness, and persistent negative thoughts. Robertson noted that Quinn exhibited difficulty finding words and his concentration and attention evidenced mild to moderate distractibility. He diagnosed Quinn with severe and recurrent major depression and alcohol dependence in full remission and assigned a GAF score of 50.

On September 21, Quinn reported that he was doing "somewhat better." He began taking Adderall with his prescriptions for Cymbalta and Abilify. Dr. Ceniceros reaffirmed the diagnosis of major depression. A month later, Quinn reported that he was doing better and Dr. Ceniceros noted that Quinn's mood was mildly dysphoric. On

2

November 9, Dr. Ceniceros affirmed the major depression diagnosis and instructed Quinn to continue his medications. On January 11, 2011 and July 11, 2011 Dr. Ceniceros noted that Quinn was stable and recommended that he continue his current levels of medications.

In August 2011, Quinn underwent a right shoulder arthroscopy with extensive debridement of the glenohumeral joint.

On September 13, 2011, Quinn reported to Dr. Ceniceros that he was not doing very well and was having increasing problems with dysphoria, agitation, and anxiety. Dr. Ceniceros noted that Quinn's response to medication was inadequate and that Quinn's mood was very dysphoric. He recommended an increase in Cymbalta, Abilify, and Xanax. Quinn returned to see Dr. Ceniceros again on October 3, but he reported that he had forgotten to pick up his new medications so he continued to have symptoms. The doctor diagnosed major depression with a GAF score of 55 and recommended the increases in dosage as discussed at the prior appointment. On November 21, Quinn reported that he was doing better on the new dosages and Dr. Ceniceros recommended that he continue at that level.

On February 8, 2012, Quinn was examined at Mercy Hospital after he took some extra Xanax and the staff at the residential treatment facility noted he was not acting like himself. He exhibited slightly slurred and slowed speech. He was diagnosed with altered mental status and benzodiazepine overdose. By February 20, Dr. Ceniceros noted that he was "quite stable."

On May 2, Quinn reported to Dr. Stephanie Swords reporting chronic pain in his shoulder and that he experienced violent mood swings with a violent temper at times. Dr. Swords noted that Quinn was positive for anxiety, depressed mood, difficulty concentrating, difficulty initiating sleep, extremity weakness, feelings of guilt, insomnia, marked diminished interest or pleasure, memory impairment, and suicidal ideation. She also observed that Quinn's cervical spine and right shoulder were tender. His remote memory was moderately impaired, and he had slow and stumbling speech with poor insight and judgment and inappropriate laughter at times. She recommended a neuropsychological evaluation.

Quinn was admitted to Mercy Hospital on July 16 and July 23 for an abscess on his arm. He had been injecting a synthetic drug. On July 27, he presented to Dr. Warren Weston at Burrell Behavioral Health for further psychiatric treatment. Quinn reported that he was doing well on his medications and Dr. Weston diagnosed depression.

On October 16, Quinn visited Frances Anderson, Psy.D., for a psychological consultative examination and memory testing. Quinn reported that he stopped drinking in January 2012 and stated that he felt depressed regularly even with medication. Dr. Anderson noted that while his speech was adequately articulate, he did have trouble with word retrieval. The doctor also noted that Quinn put forth good effort and his results were an accurate estimate of his memory functioning. He exhibited average functioning on auditory memory, but he had a "notable difficulty with tasks requiring visual memory" and difficulty with delayed memory. Dr. Anderson diagnosed alcohol abuse in remission, depressive disorder, and cognitive disorder with a GAF score of 60 and opined

4

that Quinn could "probably understand and remember simple instructions without difficulty, if they were of a verbal nature." He opined that Quinn's concentration, persistence, and pace would be adequate, as would his social abilities.

On October 16, Quinn again saw Dr. Weston and Dr. Weston noted that Quinn had poor remote memory. He affirmed the diagnosis of major depression and instructed him to continue his medications. He referred Quinn to therapy due to his stressors. Dr. Weston saw Quinn again on December 7 and December 27. On the 27th, Dr. Weston performed an outpatient clinical assessment and noted a primary diagnosis of major depression with symptoms of down mood, anger, irritability, and thoughts of helplessness and hopelessness. He was able to remember one out of three words after a five minute delay. Dr. Weston noted that Quinn found it very difficult to relay his history in the proper sequence and he had slurred speech with short-term memory problems.

Dr. Weston noted in March 2013 that Quinn had been doing pretty well and recommended that he continue his current medications. He opined that secondary to Quinn's back condition, he was in severe pain that rendered him able to sit for fifteen minutes, stand for thirty minutes, work four hours per day, lift up to ten pounds, and occasionally bend and stoop. He completed both a Medical Source Statement – Physical ("MSSP"), which set out these restrictions, and Medical Source Statement – Mental ("MSSM"), which opined that he had marked limitations in remembering locations and work-like procedures; carrying out short and simple instructions; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining an ordinary routine without special supervision; working in coordination with or proximity

5

to others without being distracted by them; making simple decisions; completing a normal workday or work week without psychologically-based symptoms; interacting with the public, asking simple questions or requesting assistance; adapting to usual work changes; and setting realistic goals. He opined that Quinn was extremely limited in his ability to understand and remember short and simple instructions, understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods.

## B. ALJ Decision

The ALJ denied Quinn's request for disability benefits, concluding that he had the Residual Functional Capacity ("RFC") to engage in substantial gainful activity. The ALJ concluded that despite Quinn's severe impairments of status-post metabolic encephalopathy, degenerative joint disease of the right shoulder, degenerative disc disease of the lumbar and cervical spine status-post laminectomy and fusion surgeries, depression, and polysubstance abuse, he retained the following RFC:

> [T]o perform light work as defined in 20 CFR 404.1567(b), except he can never climb ladders and scaffolds, crawl, or balance as a part of work activity but can frequently stoop, kneel, crouch, and climb ramps and stairs. He can never reach above the shoulder level with the right upper extremity. He must avoid concentrated exposure to vibration and all exposure to unprotected heights and dangerous moving machinery. Mentally, he is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple work-related decisions and routine workplace changes. He is further limited to occasional interaction with coworkers and no interaction with the public.

[Tr. 19]. The ALJ accorded "little weight" to Dr. Weston's report and "great weight" to the opinions of consultative examiner Dr. Anderson and State agency medical consultant Dr. Skolnick, who opined in October 2012 that Quinn had only moderate mental limitations and was capable of simple work with limited public interaction.

In determining the RFC, the ALJ considered the medical evidence of the record, as well as Quinn's testimony at the administrative hearing regarding the extent of his symptoms. At the administrative hearing, Quinn testified that he had last worked in 2011 and had suffered a head injury after falling down three flights of concrete stairs. He stated he could not stand or walk for more than twenty or thirty minutes and needed to sit down every fifteen minutes. He stated that he could sit for about twenty minutes. The last time he worked he was able to maintain employment for about four months, but was unable to focus, had difficulty finding words, and trouble concentrating. Quinn testified that he was able to put away his dishes but did not do much other cleaning. He stated that he used a notebook where he would write things down he needed to remember, and used the calendar in his cell phone to keep track of appointments.

Following this testimony, the ALJ questioned a vocational expert regarding Quinn's RFC. The vocational expert testified that a person with Quinn's RFC would be able to perform jobs such as an egg washer or bone picker.

## II. Standard of Review

"[R]eview of the Secretary's decision [is limited] to a determination of whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the

7

Secretary's conclusion. [The Court] will not reverse a decision 'simply because some evidence may support the opposite conclusion.'" *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Substantial evidence is "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010).

## III. Discussion

Quinn argues that the ALJ erred in according only little weight to treating psychiatrist Dr. Weston's opinions while affording great weight to the opinions of State agency medical consultant Dr. Skolnick and consultative examiner Dr. Anderson, and failing to develop the record regarding Quinn's physical limitations.

### A. Physical RFC Limitations

In evaluating Quinn's RFC, the ALJ identified the following physical limitations on Quinn's ability to work:

> [T]o perform light work as defined in 20 CFR 404.1567(b), except he can never climb ladders and scaffolds, crawl, or balance as a part of work activity but can frequently stoop, kneel, crouch, and climb ramps and stairs. He can never reach above the shoulder level with the right upper extremity. He must avoid concentrated exposure to vibration and all exposure to unprotected heights and dangerous moving machinery.

[Tr. 19]. The ALJ concluded that these limitations were appropriate based on his review of Quinn's medical records from 2010 through the end of 2012. The record does not include significant medical records regarding the status of Quinn's physical ailments after this date, other than Dr. Weston's March 2013 MSSP which noted that Quinn could only work four hours per day, stand and walk for thirty minutes at a time for a total of two

8

hours in a workday, sit for fifteen minutes at a time for a total of less than one hour in a workday, and lift up to five pounds. Dr. Weston also concluded that Quinn could perform only occasional bending, stooping, kneeling, crouching, crawling, reaching, handling, fingering, feeling, and depth perception, and no climbing or balancing, as well as avoid exposure to the elements. The ALJ accorded very little weight to this opinion.

The record contains substantial evidence to support the ALJ's decision not to accord weight to Dr. Weston's opinion regarding Quinn's physical limitations. As noted by the ALJ, Dr. Weston is a psychiatrist and does not appear to have any background in assessing physical limitations which may arise from shoulder or back injuries. Moreover, the record does not reflect that Dr. Weston ever performed a physical examination of Quinn or reviewed any of his medical records other than those assessing his mental status. While treating physician opinions are generally entitled to at least substantial weight, the ALJ need not afford opinions such significant weight where the context of the opinion suggests that it is not credible. *See* 20 C.F.R. § 404.1527; *Blackburn v. Colvin*, 761 F.3d 853, 860 (8th Cir. 2014); *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010).

Furthermore, Dr. Weston's evaluation of Quinn's physical disabilities is not supported by the remainder of the evidence of the record. In fact, as noted by the ALJ, the "extreme limitations grossly contradict the other findings." [Tr. 25]. Following Quinn's fall in May 2010 he exhibited a variety of significant physical problems for which he was treated with physical and occupational therapy. By September 2010, however, he exhibited a normal gait and normal extremity findings. One of his treating physicians noted that he could probably do any type of work physically. Despite

9

exhibiting mild degenerative joint and disc disease later in 2010 he continued to exhibit a full range of motion, strength, reflexes, and coordination. In August 2011 Quinn underwent arthroscopic surgery of the right shoulder, but in early 2012 exhibited a full range of motion, coordination, and strength. He continued to exhibit mobility at a high level through the end of 2012. In August 2012 an x-ray of his cervical spine revealed degenerative changes, but he continued to exhibit a normal gait and intact sensation, strength, balance, and coordination. He also stated that he walked three miles per day for exercise.

These medical records contain no support for Dr. Weston's conclusion that Quinn's physical ailments prevented him from working more than four hours per day and severely limited his mobility. Quinn contends that absent Dr. Weston's opinion, the record contains no supporting evidence from a medical professional on which the RFC determination could be based. While it is the claimant's burden to prove his disability, "[t]he ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834 (8th Cir. 2004). In this case, however, the existing record was sufficient for the ALJ to conclude that Quinn has the RFC to perform light work subject to the identified limitations.

Quinn cites *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), to support his contention that absent Dr. Weston's opinion, the record is devoid of medical evidence regarding Quinn's ability to function in the workplace. However, in September 2010, one of Quinn's treating physicians, Dr. Thomas Reinbold, opined that he could perform almost any kind of work physically. The record in *Nevland* contained no medical

10

Case 6:15-cv-03203-NKL   Document 13   Filed 12/24/15   Page 10 of 19

evaluation of the claimant's functional capacity from a treating physician. While Dr. Reinbold's opinion preceded Quinn's alleged onset date, the record contains no evidence from after September 2010 to suggest that Quinn's physical condition had significantly worsened. Two years later, Quinn told his doctor that he was still able to walk three miles per day for exercise. The medical records do not support the idea that Quinn's physical condition has so worsened since September 2010 that he is incapable of maintaining substantial gainful activity. *See Martise v. Astrue*, 641 F.3d 909, 927 ("'[T]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.'").

Unlike in *Nevland*, the record also contains an opinion from the time since Quinn's onset date. A single decision maker originally rendered the opinion, but it was reviewed and adopted by Dr. Robert Hughes, a State agency medical consultant. Dr. Hughes concluded that Quinn was less limited than found by the ALJ. [Tr. 104]. While single decision maker opinions are not generally entitled to weight, "State agency medical and psychological consultants . . . are highly qualified . . . [and] are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). Given the voluminous medical records in this case, all of which support Dr. Hughes' conclusion that Quinn is capable of light work, there is substantial evidence to support the ALJ's decision to accord great weight to this opinion.

The record also contains substantial evidence to support the ALJ's decision not to accord significant weight to Quinn's own reports regarding the extent of his disability. In

11

August 2012 he reported to his physician that he walked three miles per day for exercise. In stark contrast, he submitted a function report to the Social Security Administration dated July 25, 2012, which stated that he was incapable of walking or sitting for extended periods of time or doing any sort of physical activity. His physician also noted around that same time that while an x-ray revealed degenerative changes in his right shoulder, he demonstrated a full range of motion in his back and left shoulder. However, Quinn stated in his functional report that "both arms are not functional" and "I need neck surgery and another back surgery." [Tr. 211-12]. Given the significant inconsistencies between Quinn's reports to the Social Security Administration and his reports to his doctors and his doctors' evaluations of his functional capacity, the record supports the ALJ's decision to base the RFC determination largely on the medical records and Dr. Hughes' opinion rather than Quinn's subjective complaints of the extent of his disability.

Despite the lack of medical evidence suggesting that Quinn is significantly limited in his mobility, the ALJ concluded that he is capable of no more than "light work . . . [which does not require him to] climb ladders and scaffolds, crawl, or balance as a part of work activity . . . , [or] reach above the shoulder level with the right upper extremity." The ALJ also noted that Quinn must avoid exposure to significant vibration, unprotected heights, and dangerous moving machinery. This evaluation sufficiently accommodates for any physical limitations Quinn may have as a result of his degenerative joint, disc, and shoulder disease.

### B. Psychological RFC Limitations

The ALJ concluded that along with his physical restrictions, Quinn's RFC was limited by his mental faculties:

> Mentally, he is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple work-related decisions and routine workplace changes. He is further limited to occasional interaction with coworkers and no interaction with the public.

[Tr. 19]. In evaluating Quinn's psychological RFC limitations, the ALJ accorded great weight to the opinions of Dr. Anderson, a psychological consultative examiner, and Dr. Skolnick, a State agency psychological consultant who reviewed Quinn's file in October 2012, and little weight to the opinion of Dr. Weston, Quinn's treating psychologist.

A treating source's opinion must be given controlling weight if it is well-supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence in the record. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). Even when it is inappropriate to accord the treating physician's opinions controlling weight in light of the record, the opinions "should not ordinarily be disregarded and [are] entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). If the ALJ decides to discount a treating physician's opinion, he should "give good reasons" for his decision. *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002).

The ALJ's primary justification for disregarding Dr. Weston's opinion was that the doctor was not credible and relied too much on Quinn's subjective reports about his condition. The ALJ concluded that Dr. Weston was not credible because he grossly overstated Quinn's physical disabilities in the MSSP. While Dr. Weston's overstated

13

report in the MSSP provides grounds for the ALJ to accord less than controlling weight to Dr. Weston's opinions regarding Quinn's psychological capacity, the ALJ was not entitled to rely on this overstatement to entirely disregard Dr. Weston's opinions regarding Quinn's psychological functioning, an issue that falls within Dr. Weston's realm of expertise given his experience and training and treatment relationship with the claimant. *See Pirtle v. Astrue*, 479 F.3d 931, 934-35 (8th Cir. 2007) ("The ALJ properly relied on the portion of Dr. Ball's [the treating physician] opinion which was supported by substantial record evidence and properly disregarded the unsupported advisory portion of the treating physician's RFC.").

Moreover, unlike the conclusions in the MSSP, Dr. Weston's opinions in the MSSM are supported by more than Quinn's subjective statements about his functional capacity.[1] The record contains a slew of medical records from 2010 through 2013 showing that Quinn consistently struggled with his mental functioning. While the record shows that Quinn experienced periods of near normalcy and that medications were often able to control the worst of his depressive symptoms, these functional periods were punctuated by spans of time when Quinn's medications did not help and he exhibited

---

[1] As discussed above, the Court concludes that the record contains substantial evidence to support the ALJ's decision not to accord significant weight to Quinn's subjective complaints about the extent of his disabilities rendered to the Social Security Administration and the ALJ. However, there is nothing in the record to suggest that the psychological symptoms Quinn exhibited when being examined by doctors were exaggerated or untrustworthy. In fact, Dr. Anderson noted during her examination of Quinn in October 2012 that Quinn exhibited strong effort when undergoing psychological tests and that the results were an accurate indicator of his functional capacity. Therefore, the Court finds no reason to question the accuracy of the mental health records in this case where Quinn was examined and his complaints were interpreted by mental health professionals whose job it is to evaluate patients exhibiting symptoms like Quinn's.

14

debilitating symptoms from his depression. For example, in September 2011 Dr. Ceniceros noted that Quinn's medications were no longer helping and he was "highly dysphoric." Though he increased Quinn's medications, Quinn forgot to pick up his new medications and continued to exhibit significant symptoms in October. While forgetting to pick up a new dosage of medication might in other situations suggest that the claimant was exaggerating his symptoms, in this case Quinn's behavior appears to have stemmed from his memory problems which the record reveals were often exacerbated by periods of dysphoria.

In May 2012, Dr. Swords noted that Quinn was positive for anxiety, depressed mood, and difficulty concentrating. She also concluded that his remote memory was impaired and he had slow and stumbling speech with poor insight and judgment. [Tr. 347-49]. When Dr. Anderson evaluated Quinn in October 2012, he noted that Quinn had trouble with word retrieval and was able to recall only one of three objects correctly after ten minutes, though his remote memory was intact. When his memory was tested it revealed average functioning in tasks requiring auditory memory, but an "extremely low" ability to perform tasks requiring visual memory. He also exhibited difficulty with his ability to recall information after a twenty to thirty minute delay. Dr. Anderson noted that Quinn put forth his best effort throughout the evaluation and that the estimate of his memory functioning was accurate.

All of these medical records, along with the records from Quinn's visits with Dr. Weston where he often displayed significant dysphoria and an inhibited memory, support Dr. Weston's conclusions that Quinn had marked limitations in remembering locations

15

and work-like procedures, carrying out simple instructions, completing a normal workday or work week without psychological interruption, performing at a consistent pace, and extreme limitations in understanding, remembering, or carrying out detailed instructions. While the record contains other medical records from Quinn's doctors noting that his depression was stable and that he was not exhibiting debilitating symptoms, such records do not alone preclude a finding of disability. Mental illnesses are highly variable and periodic reprieves from significant symptoms do not necessarily indicate that an individual is capable of sustaining substantial gainful employment. Given the extent of the medical records suggesting that Quinn suffers from significant mental impairments, the ALJ was not entitled to disregard Dr. Weston's opinions regarding Quinn's mental capacity without according them substantial weight, or addressing the reasons for his conclusion that the opinion was not reflective of Quinn's mental RFC despite the existence of supporting medical records.

The ALJ also failed to accurately represent Dr. Anderson's opinion, which he relied upon in concluding that Quinn was capable of maintaining substantial gainful activity. Dr. Anderson opined only that Quinn could "probably understand and remember simple instructions without difficulty, if they were of a verbal nature." As previously discussed, Dr. Anderson served only as a consultative examiner in this case, meaning that he reviewed Quinn's medical records and examined him once. Dr. Weston rendered his opinion after treating Quinn on a myriad of occasions. The caveat "probably" in Dr. Anderson's opinion should have been weighed against the longstanding

16

treatment relationship Dr. Weston had with Quinn which led to his opinion that Quinn would be markedly limited in carrying out simple instructions.

The ALJ's failure to explicitly consider Dr. Anderson's caveat in the context of the remainder of the record is particularly notable given a question asked by Quinn's attorney during the administrative hearing. During the administrative hearing, Quinn's attorney questioned the vocational expert as follows:

> Q. . . . If an individual could probably perform simple tasks, what I mean by probably I'm just going to define it as 67 percent of the time, two-thirds of the time they'd be able to perform simple tasks, one-third of the time they would not be able to, would they be able to sustain any work?
>
> A. No.

[Tr. 71-72]. While it is unclear that Quinn's attorney's interpretation of the term "probably" is accurate, the ALJ should have at least addressed the statement and the fact that Dr. Anderson's opinion was not unequivocal. Instead of addressing Dr. Anderson's complete opinion, the ALJ simply stated in his opinion that Dr. Anderson concluded that Quinn "had 'generally adequate' mental functioning and could perform simple work." [Tr. 26]. This is an inaccurate representation of the opinion, and suggests that the ALJ substituted his own evaluation of the significance of Quinn's memory problems for the opinions of the physicians. *See Briggs v. Astrue*, 2012 WL 393875, at *6 (W.D. Mo. Feb. 6, 2012 ("It is the task of the treating physician, not the ALJ, to weigh the importance of

17

various clinical observations and to then use those judgments to develop a final medical assessment.").[2]

In addition to Dr. Anderson's opinion, the ALJ gave great weight to the opinion of Dr. Skolnick, a State agency psychological consultant. As Dr. Skolnick never examined Quinn, the opinion is entitled to less weight than Dr. Weston's. While the ALJ was entitled to consider the consultant's opinions in determining the RFC, the Court concludes that the ALJ's reliance on the opinion to the exclusion of Dr. Weston's opinion amounts to harmful error, given the support for Dr. Weston's opinion throughout the remainder of the record.

## IV. Conclusion

For the reasons set forth above, the ALJ's decision is reversed, and the case is remanded for reconsideration. On remand, the ALJ should reevaluate the weight assigned to Dr. Weston's opinion regarding Quinn's mental state and the limitations on Quinn's RFC in light of his psychological impairments.

---

[2] This conclusion is also bolstered by the fact that in discounting Dr. Weston's opinion, the ALJ also noted that "[t]he opinion also contradicts most of the psychological treatment notes since the alleged onset date, which indicate that despite varying moods, memory difficulty, and reports of ongoing depression, the claimant retained intact thought, concentration, attention, memory, judgment, and insight." [Tr. 26]. This conclusion is internally inconsistent, with the ALJ acknowledging that Quinn exhibited varying degrees of memory loss, but concluding that he retained intact memory. While an arguable deficiency in opinion writing technique is not grounds for remanding an opinion, this conclusion suggests that the ALJ may have improperly disregarded some of the evidence in the record regarding the extent of Quinn's memory impairment. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: December 24, 2015
Jefferson City, Missouri